1
2
3
4
5
6
7
8
# UNITED STATES DISTRICT COURT
9
## SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11  PRIME HEALTHCARE SERVICES, INC., | CASE NO. 11-CV-02652 JLS (RBB) |
| 12                          Plaintiff, | **ORDER (1) GRANTING KAISER DEFENDANTS' MOTION TO DISMISS; (2) DENYING AS MOOT UHW'S MOTION TO DISMISS; (3) GRANTING IN PART AND DENYING IN PART UHW'S MOTION TO STRIKE; AND (4) DENYING AS MOOT SEIU'S MOTION TO DISMISS** |
| 13  vs. | |
| 14 | |
| 15 | |
| 16 | |
| 17  SERVICE EMPLOYEES INTERNATIONAL UNION; SERVICE EMPLOYEES INTERNATIONAL UNION – UNITED HEALTHCARE WORKERS WEST; KAISER FOUNDATION HEALTH PLAN, INC.; KAISER FOUNDATION HOSPITALS; SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP,  INC., and DOES 1-10, inclusive, | (ECF Nos. 17, 20, 21, 22) |
| 18 | |
| 19 | |
| 20 | |
| 21                          Defendants. | |
| 22 | |

23        Presently before the Court are Defendants Kaiser Foundation Health Plan, Inc., Kaiser

24  Foundation Hospitals, and Southern California Permanente Medical Group's (collectively, "Kaiser

25  Defendants") Motions to Dismiss and Strike Portions of Complaint of Prime Healthcare Services,

26  Inc. ("Prime Healthcare"), (Kaiser MTD, ECF No. 17)[1]; Defendant Service Employees

27  ─────────────────

28        [1] Although Kaiser Defendants stylize their motion as one to "Dismiss and Strike," except in a footnote, they do not address their purported motion to strike.  (Kaiser MTD 12–13 n.15, ECF No. 17); (see also Resp. to UHW MTD & Mot. to Strike 22 n.10, ECF No. 33)  Nor do they address the

International Union – United Healthcare Workers West's ("UHW") Motion to Dismiss the Complaint, (UHW MTD, ECF No. 20), and Motion to Strike Portions of Complaint, (UHW Mot. to Strike, ECF No. 21); and Defendant Service Employees International Union's ("SEIU")[2] Motion to Dismiss Complaint, (SEIU MTD, ECF No. 22).[3]  Also before the Court are the associated oppositions and replies.  (ECF Nos. 32–34, 38–40)  Having considered the parties' arguments and the law, the Court **GRANTS** Kaiser Defendants' motion to dismiss, **DENIES AS MOOT** UHW's motion to dismiss, **GRANTS IN PART AND DENIES IN PART** UHW's motion to strike, and **DENIES AS MOOT** SEIU's motion to dismiss.

**BACKGROUND**[4]

Prime Healthcare brings this action against Kaiser Defendants and Union Defendants, alleging that they have together unlawfully conspired to eliminate Prime Healthcare from the healthcare services market.  The presence of Prime Healthcare in the relevant market threatens the success of Union Defendants' campaign to increase the cost of labor for healthcare workers, and threatens the success of Kaiser Defendants' business model for providing healthcare services.  And so, Kaiser and Union Defendants allegedly joined forces to eliminate Prime Healthcare as a competitor by, among other things, fixing wage rates for healthcare workers' services.

Prime Healthcare prides itself on providing quality care to its patients in an expedient fashion, on a fee-for-service basis.  By contrast, Kaiser Defendants provide all covered services to patients who are Kaiser members and charge their members fixed monthly premiums for those services.  Pursuant to federal and state law, however, Kaiser members may seek emergency care at

---

motion to strike in their reply brief, other than in a single footnote "incorporat[ing] SEIU-UHW's reply arguments in support of its motion to strike."  (Kaiser Reply 1 n.2, ECF No. 39)  But, except for paragraph 185, UHW's motion to strike and reply in support of that motion do not touch on the paragraphs Kaiser Defendants seek to have stricken (paragraphs 181–85 and 187–90).  (*See* UHW Mot. to Strike, ECF No. 21)  Thus, the Court construes Kaiser Defendants' motion only as a motion to dismiss and declines to consider the request to strike any paragraphs not discussed in UHW's motion.

[2] UHW and SEIU will be referred to collectively as "Union Defendants" throughout this Order.

[3] Kaiser Defendants join in the arguments raised in Union Defendants' motions, and Union Defendants likewise join in the arguments raised in Kaiser Defendants' motion. (Kaiser MTD 3 n.3, ECF No. 17); (UHW MTD 1, ECF No. 20); (SEIU MTD 1 n.1, ECF No. 22)

[4] All facts in the Background section are taken from the Complaint.  (Compl., ECF No. 1)

non-Kaiser hospitals (such as Prime Healthcare), and Kaiser Defendants are thereafter required to reimburse Prime Healthcare for the services rendered.  According to Prime Healthcare, this presents a threat to Kaiser Defendants' business model and has led Kaiser Defendants to seek out ways to limit or eliminate Prime Healthcare as an alternative, competing provider.  Prime Healthcare believes that Kaiser Defendants have taken such measures as advising their members to call a "nurse line" before seeking emergency care, and thereby encouraging the patient to go to a Kaiser facility rather than non-Kaiser hospital; coercing treating physicians to transfer member patients from a non-Kaiser hospital to a Kaiser facility; pressuring patients and their families to seek care only at Kaiser facilities; and unlawfully refusing to reimburse physicians who provide emergency services to Kaiser members at non-Kaiser hospitals.

Like Kaiser Defendants, Union Defendants too have an apparent incentive to limit or eliminate Prime Healthcare's market presence.  Union Defendants are alleged to be focused on eliminating competition in the market for service workers represented by Union Defendants, and to have unlawfully partnered with non-labor entities such as Kaiser Defendants in order to accomplish this market-domination strategy.  By doing so, Union Defendants ensure that they can establish supracompetitive wage rates for such services in the relevant market.  By way of example, Prime Healthcare points to the Justice for Janitors campaign (and other such strategies separate from and unrelated to the instant action) through which the SEIU obtained agreements from building owners and managers to restrict contracting for janitorial services only to employers who agreed to work with the SEIU.  More pertinent to the instant action, Union Defendants allegedly engaged in publicity campaigns to mar Prime Healthcare's reputation in furtherance of their conspiracy with Kaiser Defendants.

The complaint alleges that, at a time when Kaiser was struggling to compete in the marketplace, Kaiser Defendants and Union Defendants formed an alliance with the twin goals of manipulating the market to insulate Kaiser Defendants from competitive pressures and assisting Union Defendants in achieving market dominance.  To outsiders like Prime Healthcare, the alliance appeared to disadvantage Kaiser Defendants: at a time when Kaiser Defendants were struggling to reduce costs, they entered into agreements with Union Defendants that actually

11cv2652

1  resulted in an increased cost of labor for healthcare service workers.  But in exchange for helping

2  Union Defendants achieve market dominance, Union Defendants boosted Kaiser Defendants'

3  competitive advantage by assuring that its competitors would also be burdened by the increased

4  costs of hospital care.  In conjunction with these agreements, Kaiser Defendants allegedly

5  funneled millions of dollars in illegal payments to Union Defendants, and Kaiser and Union

6  Defendants collaborated on several legislative lobbying efforts to their mutual benefit.

7       Faced with this pressure from Kaiser and Union Defendants' allegedly anticompetitive

8  actions, Prime Healthcare filed its complaint on November 15, 2011, asserting violations of

9  Sections 1 and 2 of the Sherman Act.  (Compl., ECF No. 1)  The various motions to dismiss and to

10  strike were all filed on January 20, 2012.  (ECF Nos. 17, 20–22)  The motions were originally set

11  before the Honorable M. James Lorenz, but were later transferred to this Court's calendar on

12  February 16, 2012.  Per Judge Lorenz's Order, the motions were deemed submitted as of April 9,

13  2012, after they had been fully and completely briefed.  (Order, Dec. 8, 2011, ECF No. 7)

**LEGAL STANDARD**

15  **1. Motion to Dismiss**

16       Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that

17  the complaint "fail[s] to state a claim upon which relief can be granted," generally referred to as a

18  motion to dismiss.  The Court evaluates whether a complaint states a cognizable legal theory and

19  sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain

20  statement of the claim showing that the pleader is entitled to relief."  Although Rule 8 "does not

21  require 'detailed factual allegations,' . . . it [does] demand[] more than an unadorned, the-

22  defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, — US — , 129 S. Ct. 1937, 1949

23  (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In other words, "a

24  plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than

25  labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."

26  *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Nor does a

27  complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*,

28  129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 557).

1    "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

2    accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*,

3    550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6).  A claim is facially plausible when the facts

4    pled "allow[] the court to draw the reasonable inference that the defendant is liable for the

5    misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  That is not to say that the claim must

6    be probable, but there must be "more than a sheer possibility that a defendant has acted

7    unlawfully."  *Id.*  Facts "'merely consistent with' a defendant's liability" fall short of a plausible

8    entitlement to relief.  *Id.*  (quoting *Twombly*, 550 U.S. at 557).  Further, the Court need not accept

9    as true "legal conclusions" contained in the complaint.  *Id.*  This review requires context-specific

10   analysis involving the Court's "judicial experience and common sense." *Id.* at 1950 (citation

11   omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere

12   possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is

13   entitled to relief.'"  *Id.*  Moreover, "for a complaint to be dismissed because the allegations give

14   rise to an affirmative defense[,] the defense clearly must appear on the face of the pleading."

15   *McCalden v. Ca. Library Ass'n*, 955 F.2d 1214, 1219 (9th Cir. 1990).

16       Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court

17   determines that the allegation of other facts consistent with the challenged pleading could not

18   possibly cure the deficiency.'"  *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir.

19   1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir.

20   1986)).  In other words, where leave to amend would be futile, the Court may deny leave to

21   amend.  *See Desoto*, 957 F.2d at 658; *Schreiber*, 806 F.2d at 1401.

22   **2. Motion to Strike**

23       Under Federal Rule of Civil Procedure 12(f), a court "may order stricken from any

24   pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

25   Fed. R. Civ. P. 12(f).  However, "[m]otions to strike are generally regarded with disfavor because

26   of the limited importance of pleading in federal practice, and because they are often used as a

27   delaying tactic."  *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1152 (C.D. Cal.

28   2003).  Moreover, the motion "should not be granted unless the matter to be stricken clearly could

have no possible bearing on the subject of the litigation.  If there is any doubt whether the portion to be stricken might bear on an issue in the litigation, the court should deny the motion." *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004).  The court "views the pleadings in the light most favorable to the non-moving party." *Neilson*, 290 F. Supp. 2d at 1152.

## ANALYSIS

### 1. Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

Prime Healthcare's first claim is against all Defendants for violation of Section 1 of the Sherman Act.  Section 1 of the Sherman Act provides in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.  This section has long been interpreted to outlaw only "unreasonable" restraints.  *See United States v. Joint Traffic Ass'n*, 171 U.S. 505 (1898).  In order to state a claim under Section 1,

> claimants must plead not just ultimate facts (such as conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition.

*Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (citing *Les Shockley Racing Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507 (9th Cir. 1989); *Twombly*, 550 U.S. at 553–58).  In addition, the plaintiff must establish the relevant market and market power.  *See Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008).

### A.  Existence of a Contract, Combination, or Conspiracy

In Kaiser Defendants' and SEIU's motions to dismiss, they contest whether the complaint sufficiently pleads the existence of an agreement in violation of Section 1 of the Sherman Act. (Kaiser MTD 8–15, ECF No. 17); (SEIU MTD 24–30, ECF No. 22)  The terms "contract," "combination," and "conspiracy" in Section 1 require that there be concerted action in order for there to be a violation of Section 1 of the Sherman Act.  *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("Independent action is not proscribed.").  "[T]o allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond

1  to allegations of a conspiracy an idea of where to begin." *Kendall*, 518 F.3d at 1047 (quoting

2  *Twombly*, 550 U.S. at 565 n.10).  In short, the complaint must "answer the basic questions: who,

3  did what, to whom (or with whom), where, and when?"  *Id.* at 1048.

4          Here, Kaiser Defendants argue that Prime Healthcare has failed to state a claim under

5  Section 1 because the complaint "fails utterly to plead any ***facts*** that might plausibly show there

6  was ever any agreement between Kaiser and the SEIU to eliminate Prime from the market."

7  (Kaiser MTD 8, ECF No. 17)  To be sure, the complaint alleges "supposed terms and benefits" of

8  the alleged agreement, but Kaiser Defendants contend that such assertions are conclusory and fail

9  to state a Section 1 Sherman Act claim.  (*Id.* at 9)  Indeed, according to Union Defendants the

10 complaint fails even to allege a specific agreement, other than the collective bargaining agreement

11 ("CBA"),[5] which they argue is immune from antitrust liability.[6]  (SEIU MTD 3–4, 24–30, ECF No.

12 22)

13         Prime Healthcare disagrees, asserting that the "detailed factual allegations" of the

14 complaint establish "both directly and circumstantially the illegal arrangement among defendants."

15 (Resp. to SEIU MTD 5, ECF No. 32); *see also Twombly*, 550 U.S. at 556 (indicating that, in the

16 antitrust context, the plaintiff must allege "enough fact to raise a reasonable expectation that

17 discovery will reveal the existence of an illegal agreement").  Prime Healthcare does not elaborate

18 on how the complaint establishes "directly" an illegal agreement between Kaiser and Union

19 Defendants, instead focusing on circumstances that suggest that the alleged conspiracy and

20 agreement between Defendants is plausible.  (*See* Resp. to SEIU MTD 5–12, ECF No. 32)

21

22         [5] Based on the Court's reading of the complaint, it is unclear whether Prime Healthcare intends to assert that the CBA itself is the purportedly illegal agreement between Kaiser and Union

23 Defendants, if the CBA is evidence of some other, not specifically identified agreement between Kaiser and Union Defendants, or if the CBA is irrelevant to the antitrust allegations, intended solely as background to Kaiser and Union Defendants' long-time relationship.  Prime Healthcare's

24 opposition briefs do nothing but further muddle the issue. (*Compare, e.g.*, Resp. to UHW MTD & Mot. to Strike 16, ECF No. 33 ("[T]he Complaint alleges a conspiracy that is not based on any

25 collective bargaining agreement."), *with id.* at 14 ("[T]he Partnership Agreement, and any purported bargaining agreements were part of the larger illegal conspiracy between Kaiser and SEIU to eliminate

26 Prime as a competitor.")

27         [6] The immunity argument is flushed out in more detail in UHW's Motion to Dismiss.  (*See* UHW MTD 3–10, ECF No. 20)  In light of the Court's uncertainty as to whether Prime Healthcare

28 asserts the CBA as a basis for its antitrust claims and because the Court dismisses the complaint on alternative bases, the Court does not consider the immunity argument in this Order.

First, Prime Healthcare points to allegations of "illegal payments from Kaiser to SEIU pursuant to their conspiracy," which can only be explained as "payment for participation in an illegal conspiracy." (*Id.* at 6 (citing Compl. ¶¶ 107–10, ECF No. 1))  Second, the complaint alleges that Kaiser Defendants increased nurse staffing ratios, an action that benefitted the conspiracy's objectives but that was against Kaiser Defendants' business interests. (*Id.* at 8 (citing Compl. ¶¶ 113–18))  Third, Prime Healthcare suggests that Kaiser and Union Defendants acted in concert to push Prime Healthcare out of the market by fabricating or manipulating quality of care issues by Kaiser Defendants' competitors while "turn[ing] a blind eye" to Kaiser Defendants' own misconduct, (*id.* at 10 (citing Compl. ¶¶ 181–91)); by preserving Union Defendants' status as the union representing Kaiser Defendants' employees, (*id.* (citing Compl. ¶¶ 128–29)); and by endorsing legislation that was originally opposed by the healthcare services industry but endorsed by Union Defendants, (*id.* at 11 (citing Compl. ¶¶ 112–17)).

Even considering the mostly unrelated allegations of the complaint to the alleged conspiracy, the Court finds that Prime Healthcare has not sufficiently pleaded specific facts suggesting a conspiracy in violation of Section 1.  Prime Healthcare merely identifies the purported objective of the alleged conspiracy, and the benefits Kaiser Defendants and Union Defendants allegedly derive from their supposed agreement.  But "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality" for purposes of Section 1 of the Sherman Act, *Twombly*, 550 U.S. at 567, nor does the opportunity or motive to conspire rationally support an inference of an illegal agreement, *see In re Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999); *In re Late Fee & Over-Limit Litig.*, 528 F. Supp. 2d 953 (N.D. Cal. 2007) (holding that allegations of opportunity and motive to conspire are insufficient to state a Section 1 claim).  As alleged, Prime Healthcare has not given Defendants sufficient notice of who is alleged "to do what activity, when it was supposed to be done and how the activity was to be accomplished," so that Defendants can adequately prepare their defense.[7]

---

[7] The Court also agrees with Kaiser Defendants that, as pleaded, the complaint fails to "allege how each named defendant participated in the conspiracy," and instead "refers generically to 'Kaiser' and not to any named Kaiser defendants." (Kaiser MTD 24–25, ECF No. 17) "[G]eneral allegations as to all defendants . . . is insufficient to put specific defendants on notice of the claims against them." *In re TFT-LCD Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008).

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2011 WL 2678879, at *7 (E.D. Cal. July 7, 2011). Moreover, most of the conduct alleged appears to be independent action taken either by Kaiser Defendants or Union Defendants, but not both. Thus, the Court **GRANTS** Kaiser Defendants' motion to dismiss as to the first claim against all Defendants.[8]

### B. Other Asserted Grounds for Dismissal

Although the Court finds dismissal of the first claim warranted for failure to allege an essential element of a Section 1 violation—namely, an illegal agreement between Kaiser and Union Defendants—Prime Healthcare will have an opportunity to amend its complaint to cure the deficiencies noted. Thus, the Court will address in brief several (but not all) of the alternative bases for dismissal raised in Defendants' motions.

*(1) Restraint of Trade*

Kaiser Defendants also assert that the complaint "fails to allege that the claimed agreement unreasonably restrained trade." (Kaiser MTD 15, ECF No. 17) The parties initially dispute which analysis the Court should apply in evaluating whether the alleged agreement constitutes a restraint of trade: the per se rule or the rule of reason. "Whether a plaintiff's alleged facts comprise a per se claim is normally a question of legal characterization that can often be resolved by the judge on a motion to dismiss." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004).

Generally, whether particular conduct violates Section 1 is determined on a case-by-case basis, under the "rule of reason" analysis. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Under this test, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1010 (N.D. Cal. Mar. 24, 2008) (citing *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). A court may also consider the relative market power of the businesses involved. *Id.* (citing *Copperweld*, 467 U.S. at

---

[8] Because the Court grants Kaiser Defendants' motion to dismiss the first claim against all Defendants, which UHW and SEIU both joined in, the Court **DENIES AS MOOT** UHW's and SEIU's motions to dismiss.

768).

"Certain categories of agreements, however, have been held to be *per se* illegal, dispensing with the need for case-by-case evaluation." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988). With application of the per se rule, "there is a conclusive presumption that the restraint is unreasonable." *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 344 (1982). "*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" *Texaco*, 547 U.S. at 5 (quoting *Nat'l Soc. of Prof. Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). Moreover, "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue." *Leegin Creative Leather Prods. v. PSKS, Inc.*, 127 S. Ct. 2705, 2713 (2007).

Prime Healthcare contends that the agreement alleged here warrants *per se* analysis. (Resp. to Kaiser MTD 2–6, ECF No. 34) According to Prime Healthcare, although it is an "undisputed fact" that Kaiser Defendants do not compete in the same market as union workers,

> such reliance is misplaced because *per se* antitrust liability may attach to an individual or entity in a vertical relationship (Kaiser) who participates with the members of a *per se* illegal horizontal conspiracy (service workers seeking to maintain higher wage rates by eliminating non-union employers) to accomplish the unlawful objectives of the conspiracy.

(*Id.* at 3 (citing *Interstate Circuit v. United States*, 306 U.S. 208, 232 (1939)) Thus, argues Prime Healthcare, because SEIU, UHW, and their members are part of a horizontal conspiracy, and because Kaiser Defendants have joined in this horizontal conspiracy, the *per se* analysis applies here. (*Id.* at 3–4) But Prime Healthcare either misconstrues or mischaracterizes the allegations of its complaint. The complaint consistently references an "agreement between SEIU and Kaiser,"[9] (Compl. ¶ 9, ECF No. 1), "the Kaiser-SEIU conspiracy," (*id.* ¶ 125), or the "SEIU-Kaiser partnership," (*id.* ¶ 152); (*see also id.* ¶¶ 1, 7, 118, 150–51, 154–55, 158, 191, 201). Nowhere in the complaint does Prime Healthcare allege or allude to any conspiracy between Union Defendants *and their members*. Because of this, the Court is inclined to disregard Prime Healthcare's assertions regarding the applicability of the *per se* rule unless and until the complaint is amended to reflect this purported "*per se* conspiracy with both horizontal and vertical elements." (Resp. to

---

[9] The complaint refers to SEIU and UHW collectively as "SEIU." (Compl. ¶ 23, ECF No. 1)

Kaiser MTD 3, ECF No. 34)[10]

Prime Healthcare goes on, however, to assert that even if the *per se* rule does not apply, the complaint "has satisfied the pleading requirements for a rule of reason antitrust violation." (*Id.* at 6)  "A restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive effects." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001). Application of the rule of reason involves a shifting burden of proof.  First, "The plaintiff bears the initial burden of showing that the restraint produces 'significant anticompetitive effects' within a 'relevant market.'" *Id.* (quoting *Hairston v. Pac. 10 Conf.*, 101 F.3d 1315, 1319 (9th Cir. 1996)). Second, the defendant must proffer "evidence of the restraint's procompetitive effects." *Id.* Finally, the burden shifts back to the plaintiff to show that "any legitimate objectives can be achieved in a substantially less restrictive manner." *Hairston*, 101 F.3d at 1319.

Here, Kaiser Defendants assert that Prime Healthcare has not properly pleaded a rule of reason case because it has failed to allege that Kaiser Defendants have market power in any relevant market.  (Kaiser MTD 17, 18 & n.18, ECF No. 17)  As to the market definition, Kaiser Defendants conclusively take issue with the validity of the alleged product market, (*see id.*), but the briefing elaborates only on their objections to the relevant geographic market, (*id.* at 19 (describing the alleged geographic market as "implausible" and unsupported)).

On a motion to dismiss, an antitrust claim will survive "unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect" or is "facially unsustainable." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008) ("There is no requirement that [the market definition and market power] elements of the antitrust claim be pled with specificity."); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 200–01 (2d Cir. 2001) (Sotomayor, J.) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.").  Indeed, "the validity of the 'relevant market' is typically a factual element rather than a legal element, [and so] alleged

---

[10] The Court does not consider and makes no comment as to whether an amendment to include this type of conspiracy allegation would warrant *per se* treatment, or whether the complaint could withstand any future motions to dismiss on the alternative bases raised in Kaiser Defendants' reply brief.  (*See* Kaiser Reply 5–6, ECF No. 39)

1   markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment

2   or at trial."  *Newcal*, 513 F.3d at 1045 (citing *High Tech. Careers v. San Jose Mercury News*, 996

3   F.2d 987, 990 (9th Cir. 1993)).  Here, the validity of the alleged geographic market is prematurely

4   tested at the motion to dismiss stage.  According to Prime Healthcare,

5
> [E]mergency healthcare services involve very small geographic markets (very
> sick or critically injured patients are not going to search for lower prices or even
6   > higher quality services in a very large geographic area) and the Ninth Circuit [has
> affirmed] that a relevant geographic market for general acute care hospital
7   > services [can] consist[] of a particular county . . . .

8   (Resp. to Kaiser MTD 12, ECF No. 34 (citing *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th

9   Cir. 1997) (affirming a relevant market defined by "the general acute care hospital market in Clark

10  County, Nevada")))  The Court agrees with Prime Healthcare that it is a factual question whether

11  the geographic market should be so limited as alleged in the complaint, and the Court is therefore

12  disinclined to dismiss the complaint on this basis.

13  *(2)* Noerr-Pennington *Doctrine*

14       SEIU argues that much of the conduct alleged in the complaint is protected by the *Noerr-*

15  *Pennington* doctrine and is therefore outside the scope of the Sherman Act.  (SEIU MTD 10–19,

16  ECF No. 22)  The doctrine gets its name from *Noerr*, which held that the Sherman Act does not

17  reach concerted efforts to influence political branches of government, *E. R.R. Presidents*

18  *Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961), and *Pennington*, which

19  extended *Noerr* to efforts to influence administrative agencies, *United Mine Workers v.*

20  *Pennington*, 381 U.S. 657, 670–71 (1965).  *See Gen-Probe, Inc. v. Amoco Corp., Inc.*, 926 F.

21  Supp. 948, 955 (S.D. Cal. 1996).  Generally speaking, the doctrine bars "any claim . . . that has as

22  its gravamen constitutionally-protected petitioning activity."  *Id.* at 956; *see also Kearney v. Foley*

23  *& Lardner, LLP*, 590 F.3d 638, 644–45 (9th Cir. 2009) ("The *Noerr-Pennington* doctrine derives

24  from the Petition Clause of the First Amendment and provides that 'those who petition any

25  department of the government for redress are generally immune from statutory liability for their

26  petitioning conduct.'" (quoting *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006))).

27       Prime Healthcare opposes dismissal under the *Noerr-Pennington* doctrine on two bases:

28  (1) the conduct alleged does not constitute "petitioning conduct," (Resp. to SEIU MTD 13–15,

1    ECF No. 32); and (2) the sham exception to the *Noerr-Pennington* doctrine is sufficiently pleaded

2    and applies here, (*id.* at 15–24).  First, Prime Healthcare asserts that the complaint alleges

3    activities "directed towards private individuals and entities (*e.g.* Prime's physicians, the Board of

4    Directors of Prime's hospitals, the media, and Prime's customers)," not the government, and thus

5    the activities do not constitute "petitioning conduct" under the doctrine.  (*Id.* at 13 (citing SEIU

6    MTD 14–15, ECF No. 22; Compl. ¶¶ 157, 159, 164, 170))  SEIU argues, however, that some of

7    the conduct alleged is "classic petitioning activity prompted at governmental action," (SEIU MTD

8    14, ECF No. 22 (lobbying for legislation, seeking executive enforcement of laws)); other conduct

9    is "part and parcel of [Union Defendants'] legislative and executive petitioning," (*id.* at 14–15

10   (dissemination of critical reports and flyers)); and that other conduct that might be "arguably

11   outside *Noerr-Pennington*" is nevertheless insufficiently pleaded, (*id.* at 15 (phone

12   conversations)).  Given the intense factual findings required to assess whether the conduct alleged

13   constitutes petitioning conduct, or is "conduct incidental" to such conduct, *Sosa*, 437 F.3d at 934

14   (internal quotation marks omitted), the Court is hesitant to resolve this issue at the motion to

15   dismiss stage.[11]

16          Even assuming Union Defendants' conduct falls within the ambit of *Noerr-Pennington*

17   protection, Prime Healthcare asserts that the complaint alleges sufficient facts to invoke the "sham

18   exception" to the *Noerr-Pennington* doctrine.  Petitioning conduct generally protected by *Noerr-*

19   *Pennington* loses its doctrinal protection when it is nothing more than a "mere sham."  *Noerr*, 365

20   U.S. at 144.  The scope of the so-called sham exception "depends on the type of governmental

21   entity involved."  *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998).  "If it is the

22   legislature, the sham exception is extraordinarily narrow.  But if it is the judicial branch, this

23   _____

24          [11] The Court recognizes the need to assume the truth of Prime Healthcare's allegations at the
     motion to dismiss stage, *Kearney*, 590 F.3d at 646, and notes that much of the alleged conduct is not
25   directed toward the government.  (*See, e.g.*, Compl. ¶ 167, ECF No. 1)  Simply because Union
     Defendants' conduct was not exclusively communicated directly toward the government is not the end
26   of the inquiry, however.  Indeed, *Noerr* itself "extended immunity not only to . . . direct
     communications with legislators but also to [a] public relations campaign, finding that the latter's aim
27   was to influence the passage of favorable legislation."  *Sosa*, 437 F.3d at 934 (citing *Noerr*, 365 U.S.
     at 140–43)); *see also id.* at 935 ("[C]ommunications between private parties are sufficiently within
28   the protection of the Petition Clause to trigger the *Noerr-Pennington* doctrine, so long as they are
     sufficiently related to petitioning activity.").

circuit recognizes three categories of anticompetitive behavior that can amount to a sham . . . ."

*Id.* at 1061; *see also Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1094 (9th Cir. 2000)

("The sham exception is more easily applied to litigation . . . than it is to lobbying before executive

or legislative bodies."). The Court will consider only the narrower lobbying exception here,

saving consideration of the litigation exception for another day.[12]

As to the purported lobbying efforts, Prime Healthcare characterizes Union Defendants'

conduct as "sham and baseless," (Resp. to SEIU MTD 16, ECF No. 32), arguing that Union

Defendants "use[d] the governmental *process*—as opposed to the *outcome* of that process—as an

anticompetitive weapon," *City of Columbia v. Omni Outdoor Adver.*, 499 U.S. 365, 380 (1991);

*accord Empress LLC v. City & Cnty. of S.F.*, 419 F.3d 1052, 1057 (9th Cir. 2005); *Manistee Town*

*Ctr.*, 227 F.3d at 1094–95. Even assuming the truth of Prime Healthcare's allegations, however,

the Court has a hard time deciphering how the alleged conduct can fall within the sham exception.

For example, Prime Healthcare alleges that Union Defendants published false accounts of Prime

Healthcare's noncompliance with seismic safety requirements, (Compl. ¶ 157, ECF No. 1), with

certain financial disclosures mandated by the Securities and Exchange Commission, (*id.* ¶ 158),

and with Medicare reimbursement criteria or hospital safety standards and licensing requirements,

(*id.* ¶ 159, 162). And, Prime Healthcare alleges that Union Defendants forwarded such

disparaging information to government officials, (*id.* ¶ 160), and contacted government officials to

beseech them to stop issuing licenses to Prime Healthcare or to initiate legal action against them,

(*id.* ¶ 162). Other alleged contacts consist of direct communications with an unnamed state

legislator to pass a bill to restrict Prime Healthcare's ability to acquire additional hospitals, among

other things. (*See id.* ¶¶ 168–69, 177).

In summary, it would appear that all, or substantially all, of the alleged lobbying conduct

was directed toward lobbying executive officials to take action to enforce laws against Prime

Healthcare, or lobbying legislators to pass laws that might adversely affect Prime Healthcare. As

---

[12] The parties dispute whether a heightened pleading requirement applies to sham-exception allegations. (*See* SEIU MTD 13, ECF No. 22; Resp. to SEIU MTD 16, ECF No. 32; SEIU Reply 6, ECF No. 38) Because the Court does not rely on *Noerr-Pennington* to dismiss the complaint, and because the Court is skeptical of the sufficiency of Prime Healthcare's allegations under either standard, it declines to resolve this dispute at this time.

11cv2652

1  alleged, then, Prime Healthcare has alleged only that Union Defendants used the *outcome* of the

2  petitioning process—getting laws enforced and bills passed—not the *process itself* as an

3  "anticompetitive weapon." *Omni Outdoor Adver.*, 499 U.S. at 380.  As noted above, certain of

4  Prime Healthcare's allegations might present a closer call, but considered as a whole, the Court is

5  doubtful whether Prime Healthcare has sufficiently invoked the sham exception here.

6  *(3) Disparaging Speech*

7         SEIU additionally moves to dismiss on the basis that "the allegations do not overcome the

8  presumption that allegedly disparaging speech has no actionable effect on competition."  (SEIU

9  MTD 19, ECF No. 22 (citing *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal &*

10 *Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997))  According to Prime Healthcare,

11 however, *Harcourt Brace*'s de minimis presumption is inapplicable here, where "a competitor uses

12 a non-competitor to make the disparaging statements, which gives them the appearance of

13 objectivity and lack of bias."  (Resp. to SEIU MTD 25, ECF No. 32 (citing *TYR Sport Inc. v.*

14 *Warnaco Swimwear Inc.*, 679 F. Supp. 2d 1120, 1132 (C.D. Cal. 2009))  *TYR Sport* explains that

15 "[t]he de minimis presumption rests on the Ninth Circuit's reasoning that 'buyer distrust of a

16 seller's disparaging comments about a rival seller should caution us against attaching much weight

17 to isolated examples of disparagement.'"  *TYR Sport*, 679 F. Supp. 2d at 1132 (quoting *Harcourt*

18 *Brace*, 108 F.3d at 1152).  But where the disparaging comments are not made by a "rival" or

19 competitor, the reason for the presumption no longer applies.  *See id.*

20        Taking the allegations as true, the Court is inclined to agree with Prime Healthcare that the

21 de minimis presumption has no applicability on these facts.  The complaint does not allege that the

22 disparaging statements about Prime Healthcare's quality of care were made by its

23 competitors—namely, Kaiser Defendants—but rather that Union Defendants published these

24 comments.  And Kaiser Defendants allegedly "routinely cite[d]" to these disparaging publications

25 "as 'independent' evidence" of Prime Healthcare's poor quality of care.  (Compl. ¶ 166, ECF No.

26 1)  As "independent" evaluators of the healthcare industry, (*id.*), Union Defendants had "added

27 credibility, which [Kaiser Defendants] would not have enjoyed speaking solely [as competitors in

28 the industry]," *TYR Sport*, 679 F. Supp. at 1132.  For this reason, the Court would be inclined to

1    deny SEIU's motion to dismiss on this basis.[13]

2    **2.  Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**

3              Prime Healthcare's second, third, and fourth claims against Kaiser Defendants arise out of

4    Section 2 of the Sherman Act.[14]  (Compl. ¶¶ 206–38, ECF No. 1)  To state a Section 2 claim,

5    Prime Healthcare must allege the following: "(1) the relevant market that defendant has

6    monopolized; (2) possession of monopoly power in that market; and (3) willful acquisition or

7    maintenance of that power through competitively unreasonable means, rather than as a

8    consequence of a superior product, business acumen, or historic accident."  *High Tek USA, Inc. v.*

9    *Heat & Control, Inc.*, 2012 U.S. Dist. LEXIS 100538, at *8 (N.D. Cal. July 18, 2012) (citing

10   *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).  To prevail on a Section 2 claim

11   for attempted monopolization, "a plaintiff must demonstrate four elements: (1) specific intent to

12   control prices or destroy competition; (2) predatory or anticompetitive conduct directed toward

13   accomplishing that purpose; (3) a dangerous probability of success; and (4) causal antitrust

14   injury."  *Forsyth*, 114 F.3d at 1477 (citing *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433

15   (9th Cir. 1995)).  And finally, "[t]o prove a conspiracy to monopolize in violation of § 2, Plaintiff

16   must show four elements: (1) the existence of a combination or conspiracy to monopolize; (2) an

17   overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal

18   antitrust injury."  *Stanislaus Food Prods.*, 2011 U.S. Dist. LEXIS, at *12 (citing *Paladin Assocs.,*

19   *Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003)).

20             Kaiser Defendants move to dismiss Prime Healthcare's second claim for monopolization

21   because "Prime fails to allege beyond mere conclusions that Kaiser possessed market power in any

22   market," (Kaiser MTD 18, ECF No. 17), and because "[t]he Complaint also fails to allege facts

23   _____

24        [13] Notwithstanding the Court's comments on the arguments raised in SEIU's motion to dismiss,
     as indicated *supra* at note 8, the motion is denied as moot in light of the Court's granting of Kaiser
25   Defendants' motion to dismiss, which dismissed the first claim against all Defendants.

26        [14] Section 2 provides that "[e]very person who shall monopolize, or attempt to monopolize,
     or combine or conspire with any other person or persons, to monopolize any part of the trade or
27   commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . ."
     15 U.S.C. § 2.  In claims two through four, Prime Healthcare claims Kaiser Defendants are guilty of
28   monopolization, attempted monopolization, and conspiracy to monopolize. (Compl. ¶¶ 206–38, ECF
     No. 1)

showing that Kaiser willfully acquired or maintained any supposed monopoly power," (*id.* at 20).
They further assert that the third claim for attempted monopolization fails because Prime
Healthcare fails to plead specific intent to monopolize or a dangerous probability of achieving
monopoly power.  (*Id.* at 20–21)  And finally, Kaiser Defendants move to dismiss the conspiracy
to monopolize claim for failure to plead any conspiracy between Kaiser Defendants and Union
Defendants, and failure to plead specific intent to monopolize.  (*Id.* at 21–22)

As the Court has already found, Prime Healthcare has failed to allege sufficient facts to
support an actionable agreement or conspiracy between Kaiser Defendants and Union Defendants.
*See supra* at 9.  Although "[o]ffenses under section 1 and section 2 of the Sherman Act are legally
distinct," *Stanislaus Food Prods.*, 2011 U.S. Dist. LEXIS 72764, at *39 (citing, *inter alia*, *Am.
Tobacco Co. v. United States*, 328 U.S. 781, 788 (1946)), this inadequacy is fatal to Prime
Healthcare's Section 2 claims as well because those claims are all premised on activity *by Union
Defendants*, not activity by Kaiser Defendants.  (*See* Kaiser Reply 6–8, ECF No. 39)  And, if there
is no agreement between Kaiser Defendants and Union Defendants, then the Court fails to see how
Union Defendants' conduct can result in a Section 2 violation by Kaiser Defendants.

For example, in support of its argument regarding supracompetitive pricing,[15] Prime
Healthcare points to allegations in the complaint regarding Union Defendants' "campaigns . . . to
mitigate competition against Kaiser by forcing each hospital system to adopt the same
uncompetitive business model or to make each system's costs prohibitive by spending money
responding to attacks from the union."  (Compl. ¶ 146, ECF No. 1); (*see also* Resp. to Kaiser MTD
14, ECF No. 34 (citing Compl. ¶¶ 83–151, ECF No. 1))  The same is true for the allegations which
supposedly provide circumstantial evidence of monopoly power.  (Resp. to Kaiser MTD 14–15,
ECF No. 34 (citing Compl. ¶¶ 132–51))  Such conduct was to the independent benefit of Union
Defendants: by convincing other hospital systems to unionize, Union Defendants came closer to
establishing their goal of market dominance.  Without an agreement between Union Defendants

---

[15] "Monopoly power . . . is the power to control prices or exclude competition," and can be demonstrated "by direct evidence or by circumstantial evidence."  *Forsyth*, 114 F.3d at 1475 (internal quotation marks omitted).  "Direct proof of market power may be shown by evidence of restricted output and supracompetitive prices."  *Id.* at 1475.

11cv2652

1   and Kaiser Defendants, none of the allegations of the complaint support a Section 2 claim against

2   Kaiser Defendants because actions taken by Union Defendants do not support a reasonable

3   inference that Kaiser Defendants willfully acquired monopoly power or had the specific intent to

4   monopolize.  For these reasons, the Court **GRANTS** Kaiser Defendants' motion to dismiss the

5   second, third, and fourth claims for Section 2 violations.

6   **3.  Motion to Strike**

7          Although the motion to strike might be deemed mooted by the Court's granting of Kaiser

8   Defendants' motion to dismiss, because the Court allows Prime Healthcare an opportunity to

9   amend, it will address the motion to strike now in order to facilitate amendment.  Defendants move

10  to strike several allegations from the complaint as being immaterial, impertinent, or scandalous.

11  (UHW Mot. to Strike, ECF No. 21)  "Immaterial" or "impertinent" allegations are those which

12  lack any relationship to the asserted claims.  *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th

13  Cir. 1993).  "Scandalous" allegations include those which "cast a cruelly derogatory light on a

14  party."  *In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000).  The

15  Court agrees that Prime Healthcare has included several allegations that have no bearing on the

16  instant action, but does not agree that all of the cited paragraphs are immaterial and impertinent, or

17  scandalous.  Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** the motion to

18  strike, as detailed.

19         First, Defendants request that the Court strike paragraphs 8 and 53–82, which they argue

20  "have no relationship to the complaint's antitrust claims," (UHW Mot. to Strike 2, ECF No. 21),

21  and characterize as "superfluous historical allegations" properly subject to a motion to strike, (*id.*

22  at 3).  Prime Healthcare counters that these allegations support the claim that Union Defendants

23  have "a deliberate market domination plan in place, [are] pursuing that plan, and [have] repeatedly

24  obtained unlawful agreements with complicit employers," which demonstrates Union Defendants'

25  "purpose, motive, and consistent and long-standing pattern of conduct."  (Resp. to UHW MTD &

26  Mot. to Strike 23, ECF No. 33)  The Court, in its discretion, finds it appropriate to strike only the

27  following "background" paragraphs from the complaint: Paragraphs 60–82.  The stricken

28  paragraphs deal with Union Defendants' purported illegal agreements in other industries, such as

1  in the janitorial services industry, the security guard industry, and the home health care and child

2  care services industry. These paragraphs cross the line from constituting mere background

3  allegations to encompassing legal conclusions risking significant expansion of the necessary

4  discovery in this matter, as well as complicating the litigation by requiring resolution of several

5  cases within a case.

6      Second, Defendants seek to have paragraphs 68–70, 80, 127–28, and 185 and Exhibit G

7  stricken because these allegations pertain to "litigation and administrative matters that are wholly

8  unrelated to the issues and claims in this action." (UHW Mot. to Strike 5, ECF No. 21) Because

9  the Court has already stricken 68–70 and 80, it focuses on 127–28 and 185 and Exhibit G now.

10  The Court declines to strike paragraphs 127 and 128; prior findings of "collusion between Kaiser

11  and SEIU," (Compl. ¶ 128, ECF No. 1), even if unrelated to the instant action, are relevant to

12  whether Defendants illegally conspired as alleged in the complaint. Likewise, the Court finds the

13  allegations of prior enforcement matters against Kaiser Defendants, for which Union Defendants

14  have allegedly remained conspicuously silent, potentially relevant to this action and accordingly

15  declines to strike paragraph 185 or Exhibit G. *Platte Anchor Bolt*, 352 F. Supp. 2d at 1057.

16                          **CONCLUSION**

17      For the reasons stated above, the Court **GRANTS** Kaiser Defendants' motion to dismiss

18  (ECF No. 17) and **DISMISSES** the complaint in its entirety **WITHOUT PREJUDICE**. The

19  remaining motions to dismiss (ECF Nos. 20, 22) are **DENIED AS MOOT**. UHW's motion to

20  strike is **GRANTED IN PART AND DENIED IN PART**: Paragraphs 60–82 are Ordered

21  stricken from the complaint.

22      If Prime Healthcare wishes, it **SHALL FILE** an amended complaint within <u>twenty-one

23  days</u> of the date this Order is electronically docketed. Failure to file an amended complaint by this

24  date may result in dismissal with prejudice.

25      **IT IS SO ORDERED**.

26  DATED: August 30, 2012

27  _____
    Honorable Janis L. Sammartino
28  United States District Judge