**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PRIME HEALTHCARE SERVICES, INC., | Civil Action No. 11-cv-2652-GPC-RBB |
| Plaintiff, | |
| v. | |
| SERVICE EMPLOYEES INTERNATIONAL UNION; SERVICE EMPOLOYEES INTERNATIONAL UNION-UNITED HEALTHCARE WORKERS WEST; KAISER FOUNDATION HEALTH PLAN, INC.; KAISER FOUNDATION HOSPITALS; SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, INC., and DOES 1-10, inclusive, | **ORDER GRANTING:**<br>**(1) KAISER DEFENDANTS'**<br>**MOTION TO DISMISS;**<br>**(2) SEIU's MOTION TO DISMISS**<br>**(3) SEIU-UHW's MOTION TO**<br>**DISMISS**<br><br>[ECF NOs. 57, 59, 64] |
| Defendants. | |

Before the Court is a motion to dismiss filed by Defendants Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and Southern California Permanente Medical Group's ("Kaiser Defendants").   Also before the Court are motions to dismiss filed by Defendant Service Employees International Union – United Healthcare Workers West ("SEIU-UHW") and Defendant Service Employees International Union ("SEIU") (together, "Union Defendants").  For the reasons stated below, the Court hereby **GRANTS** Kaiser Defendants' and Union Defendants' motions to dismiss.  (ECF Nos. 57, 59, 64.)

**I. Procedural History**

Plaintiff Prime Healthcare, Inc. ("Prime Healthcare" or "Plaintiff") filed the original complaint on November 15, 2011. (Compl., ECF No. 1.)  On August 30, 2012, the Court granted Kaiser Defendants' motion to dismiss the complaint with leave to amend. (ECF No. 43.)  On September 21, 2012, Prime Healthcare filed a first amended complaint. (ECF No. 46, "FAC".)  This case was transferred to the undersigned judge on October 6, 2012.  (ECF No. 52.)  On October 26, 2012, Kaiser Defendants and SEIU-UHW filed motions to dismiss. (ECF Nos. 57, 59.)  On November 27, 2012, Defendant SEIU filed an amended motion to dismiss. (ECF No. 64.)  On April 5, 2013, the Court held a hearing on the pending motions.

**II. First Amended Complaint Allegations**

**A. The Parties**

Prime Healthcare has filed this action against Kaiser Defendants and Union Defendants alleging they have unlawfully conspired to eliminate Prime Healthcare and other competing hospitals from the healthcare services market.  Prime Healthcare is the sole shareholder of corporations which own and operate eleven acute-care hospitals located throughout Southern California.  Prime Healthcare provides care to its patients on a fee-for-service basis.  Its hospitals are not owned

by or otherwise affiliated with health care service plans or health maintenance organizations, and most Prime patients enter hospitals through emergency rooms or other emergency care centers.  By contrast, Kaiser Defendants provide all covered healthcare services to patients who are Kaiser members and charge their members fixed monthly premiums for those services.  Under state and federal law, Kaiser members may seek emergency care at any hospital, including any Prime Healthcare hospitals, and Kaiser Defendants must reimburse the non-member hospital for any services rendered.

SEIU is an unincorporated labor association that represents units of workers and negotiates terms and conditions of employment for the workers it represents. SEIU-UHW is a local union affiliate of SEIU located in California.  SEIU-UHW represents individuals working in California's hospitals and clinics as nurses, aids, assistants, managers, clerks, therapists, and other healthcare workers and negotiates terms and conditions of employment for the workers it represents. SEIU has control over all of its local unions and their union members, and therefore has control over SEIU-UHW.

**B. The Service and Geographic Markets**

The relevant service markets are (1) hospital emergency care services provided at Kaiser and non-Kaiser facilities to the general public; (2) general acute-care hospital services, which encompasses a broad cluster of basic medical diagnostic and treatment services provided at Kaiser and non-Kaiser facilities; and (3) the services provided by healthcare workers at Kaiser and non-Kaiser facilities, including but not limited to direct patient care duties essential to the provision of the services described in (1) and (2). The relevant geographic market includes San Bernardino, San Diego, Los Angeles, and Orange Counties, California.  Plaintiff also identifies several subregional geographic markets.

Prime Healthcare alleges its business model offers a unique alternative to the Kaiser model and therefore threatens Kaiser's dominance in the aforementioned service and geographic markets. Prime Healthcare alleges its position in the market threatens the ability of Union Defendants to raise wages and expand representation of healthcare workers. This threat has allegedly caused Union Defendants to unlawfully partner with non-labor entities such as Kaiser Defendants in a market domination strategy to eliminate Prime Healthcare from the aforementioned markets. Prime Healthcare alleges Defendants targeted numerous hospitals in the market that posed a threat to Defendants, and Prime Healthcare is now the most recent target of Defendants' conspiracy.

**C. Agreement to Restrain Trade in Violation of Sections 1 and 2 of the Sherman Act**

Prime Healthcare alleges that, beginning in 1997, Kaiser Defendants and Union Defendants entered into a conspiracy through several oral and written agreements between themselves over the past fifteen years to restrain trade in violation of Sections 1 and 2 of the Sherman Act. Prime Healthcare describes the overall conspiracy as:

> (i) A horizontal agreement between SEIU members who compete among themselves for wages and other benefits of employment, their leadership, and the defendant union entities themselves (including the SEIU-controlled Coalition of Kaiser Permanente Unions, its leadership, and its union members); (ii) facilitated and assisted by a vertical conspiracy and combination among these union members, leaders and entities and Kaiser Permanente entities.

Plaintiff alleges that, over several years, Kaiser Defendants and Union Defendants used a series of meetings to negotiate labor partnership agreements as a cover-up

for strategy sessions to plan a conspiracy to restrain competition in the market. Prime Healthcare alleges the labor partnership agreements are illegal and evidence of a broader conspiracy. The meetings were "secret discussions" used to advance the goals of the conspiracy, evidenced by Defendants' actions against Prime Healthcare and other hospitals. Prime Healthcare alleges Defendants conspired to increase healthcare workers' wages to harm competition in the emergency and acute-care hospital markets. To achieve this objective, Plaintiff alleges Union Defendants conducted a campaign against Prime and other hospitals pursuant to an agreement whereby Union Defendants received concessions on wages and working conditions for its union members that worked for Kaiser Defendants, as well as direct payments through intermediaries, in exchange for helping eliminate Kaiser competitors.

Prime Healthcare alleges these actions have restrained competition in the aforementioned service markets. As a result, consumers face higher prices and reductions in quality of care and quantity of services. Prime Healthcare alleges it has suffered injury from the Defendants' campaign to eliminate Prime from the market, including higher than competitive wages for its healthcare workers, loss of actual and potential customers, lost profits, and loss of business goodwill.

### D. Claims for Relief

Based on the foregoing allegations, Prime Healthcare asserts the following claims for relief: (1) Violation of Section 1 of the Sherman Act (against all Defendants); (2) Monopolization in violation of Section 2 of the Sherman Act (against Kaiser Defendants); (3) Attempted Monopolization in Violation of Section 2 of the Sherman Act (against Kaiser Defendants); (4) Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act (against Kaiser Defendants).

### III. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007). A claim has facial plausibility, "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While a plaintiff need not give "detailed factual allegations," a plaintiff must plead sufficient facts that, if true, "raise a right to relief above the speculative level." Twombly, 550 at 545. "[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir.2009).

In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. Thompson v. Davis, 295 F.3d 890, 895 (9th Cir. 2002). Legal conclusions, however, need not be taken as true merely because they are cast in the form of factual allegations. Ileto v. Glock, Inc., 349 F.3d 1191, 1200 (9th Cir. 2003). In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." Twombly, 550 U.S. at 562. If a plaintiff fails to state a claim, a court need not permit an attempt to amend a complaint if "it determines that the pleading could not possibly be cured by allegation of other facts." Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 247 (9th Cir.1990).

## IV. DISCUSSION

### A. Violation of Section 1 of the Sherman Act

Prime Healthcare's first claim is against all Defendants for violation of Section 1 of the Sherman Act. Under this provision, "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. While this section outlaws only "unreasonable" restraints, it "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984). To state a Section 1 claim, claimant must plead not just ultimate facts, but evidentiary facts which, if true, will prove:

> (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition.

Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1047 (9th Cir. 2008) (citing Les Shockley Racing Inc. v. National Hot Rod Association, 884 F.2d 504, 507(9th Cir.1989); see also Bell Atlantic v. Twombly, 550 U.S. 544 (2007).

Kaiser Defendants challenge the first amended complaint on the grounds that it fails to meet the applicable pleading standard requiring specificity. (ECF No. 59 ("Kaiser Mtn.").)

### 1. Agreement, Combination, or Conspiracy

The Supreme Court has long accepted that "[n]o formal agreement is necessary to constitute an unlawful conspiracy." Am. Tobacco v. United States, 328 U.S. 781, 809 (1946). Indeed, conspiracy may be proved by inferences that may be drawn from the behavior of the alleged conspirators. See, e.g., ES Dev. v.

RWM Enterprises, 939 F.2d 547, 553-554 (8th Cir. 1991) ("Antitrust plaintiff may prove existence of a combination or conspiracy by providing either direct or circumstantial evidence sufficient to warrant finding that conspirators had unity of purpose or common design and understanding, or meeting of minds in unlawful arrangement"); In re Late Fee and Over-Limit Fee Litigation, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) (applying Twombly standard to conspiracy-issue allegations and dismissing because plaintiff failed to provide details as to when, where, or by whom the alleged agreement was reached; explaining that "[i]n Twombly, the Supreme Court dismissed as insufficient similar 'stray statements' about agreements, when unsupported by concrete allegations about the content and circumstances of any actual agreement").

Prime Healthcare claims the Defendants engaged in anticompetitive, unfair, exclusionary, predatory and deceptive conduct with the specific intent to raise the costs of its competitors, restrain market competition, and monopolize the market. (FAC ¶ 11.)   According to Prime Healthcare, written and verbal agreements, circumstantial evidence and parallel conduct between Kaiser Defendants and Union Defendants are sufficient evidence to show the existence of a conspiracy.

### a. Written Agreements

Plaintiff alleges certain labor partnership agreements between Kaiser Defendants and Union Defendants are illegal under Section 1.  The FAC alleges the 1997 labor agreement, along with the Defendants' 2000, 2002, 2005, 2010 and 2012 labor agreements, are themselves illegal and constitute evidence of a broader conspiracy. (FAC ¶¶ 93, 115, 118, 130, 148, 163.)  Plaintiff alleges Defendants executed these agreements under the "guise of the collective bargaining process." (FAC ¶42.)  Kaiser Defendants disagree, and contend that the labor partnership agreements are protected by statutory and nonstatutory exemptions, and that even

**Civil Action No. 11-cv-2652-GPC-RBB**

if not protected, the agreements on their face do not suggest a conspiracy.[1] (Kaiser Mtn. at 5-10.)

Plaintiff alleges specific provisions of these agreements "mask" or "disguise" the unlawful intent of the conspiracy, and reveal that the objective of the agreements is Kaiser Defendants' market dominance rather than collective bargaining.  Plaintiff cites the following agreement provisions:

The 1997 Agreement.  The purpose of the agreement is to "[a]ssist Kaiser Permanente in achieving and maintaining market leading competitive performance" and "[e]xpand Kaiser Permanente's membership in current and new markets." (FAC ¶ 101 (citing the 1997 Agreement, Section 1, Purpose).)

The 2000 Agreement.   The agreement expressly stated that it was designed to support the "implementation of the Partnership on a national and local level…" and to "serve as the blueprint for making Kaiser Permanente the employer and care provider of choice." (FAC ¶ 114, 116, (citing 2000 Agreement at 6).)

The 2002 Agreement.   "Kaiser Permanente's success is contingent on our ability to transform our organization. This shared vision compels us to align policies and practices to support the success of the Labor Management Partnership, to provide systems and information to prepare union and management leaders and employees for challenging new roles, and to substantially engage the workforce in making Kaiser Permanente the best. Achieving this will require our collective commitment to unwavering sponsorship, leadership and investment."  (FAC ¶ 123 (citing 2002 Tentative Agreement at 8).)

The 2005 Labor Agreement. "The parties reaffirm their commitment to market Kaiser Permanente to new and existing union groups and to establish . . . appropriate funding, to ensure the joint Labor Management Partnership marketing effort . . . result[s] in increased enrollment in Kaiser Foundation Health Plan." (FAC ¶ 131 (citing 2005 National Agreement between Kaiser Permanente and Coalition of Kaiser Permanente Unions).)

---

[1] At this time, the Court refrains from addressing whether Union Defendants are afforded statutory and nonstatutory exemptions to the anti-trust laws.

**Civil Action No. 11-cv-2652-GPC-RBB**

The 2010 Labor Agreement. "The parties will work in a proactive manner on other growth potential…." "Integration of labor into the normal business structures of the organization does not mean co-management, but rather full participation in the decision-making forums and processes at every level of the organization…." "The parties reaffirm their commitment to market Kaiser Permanente to new and existing union groups and to establish the necessary strategic and policy oversight, as well as appropriate funding, to ensure the joint Labor Management Partnership marketing effort becomes a successful sustainable model, resulting in increased enrollment in the Kaiser Foundation Health Plan. The coalition and its affiliated unions, acting in the interest of and in support of the Partnership, will use their influence to the greatest extent possible to assure that unionized Employers, union health and welfare trusts and Taft-Hartley trusts operating in, or providing benefits to union members in areas served by Kaiser Permanente, offer the Kaiser Foundation Health Plan." (FAC ¶¶ 149-51 (citing 2010 National Agreement between Kaiser Permanente and The Coalition of Kaiser Permanente Unions).)

Upon review of these allegations, the Court concludes Plaintiff has not sufficiently alleged that the labor partnership agreements themselves constitute "a contract . . . by which the persons or entities intended to harm or restrain trade." A plain reading of the agreement provisions to "increase Kaiser's membership in current and new markets," "market Kaiser Permanente to new and existing unions," or "increase enrollment in the Kaiser Foundation Health Plan," do not suggest Defendants entered into the agreements with an ulterior objective of "market dominance." The agreements suggest Kaiser Defendants and Union Defendants sought to grow membership in Kaiser's Healthcare plan, a mutual benefit for Kaiser and its union employees. Nothing on the face of these labor partnership agreements suggest any anti-competitive motive, objective or purpose intended to restrain trade.

Prime Healthcare asks the Court to read into the labor partnership agreements an illegal purpose because the agreements were written in "code

**Civil Action No. 11-cv-2652-GPC-RBB**

language" to disguise their activities aimed at market domination and memorialize an otherwise secret agreement to eliminate Kaiser Defendants' competitors, including Prime. (FAC ¶¶ 98,168.)  The allegation of "code language" is conclusory and Plaintiff has failed to provide any specificity in support of its "code language" theory.  Rule 8(a) "asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 668 (2009). The select provisions, even standing alone, do not suggest any lawful behavior. Moreover, the Court refuses to infer the existence of an illegal agreement simply because the labor partnership agreements may be innovative or on a larger-scale than local collective bargaining agreements.

As such, the Court finds Plaintiff has failed to sufficiently allege that the national labor partnership agreements themselves constitute agreements in violation of antitrust law.

### b. Verbal Agreements

Plaintiff further alleges that over the course of a fifteen year period, Kaiser Defendants and Union Defendants engaged in a series of meetings and negotiations to "coordinate the specific strategies to harm and destroy Kaiser's competitors, including Prime," which led to verbal agreements to help Kaiser achieve "market domination." (FAC ¶¶ 111-12, 117-118, 124, 127, 136-37, 139-142, 156-61, 169-70.)

Kaiser Defendants argue Plaintiff has failed to allege the existence of any agreement, combination or conspiracy. (Kaiser Mtn. at 5.)  Plaintiff argues it need not plead details of the formation and operation of the conspiracy, and it has pled sufficient facts to suggest many written and verbal agreements were developed. (Prim Reply at 24.)  Plaintiff relies on <u>Stanislaus Food Products</u>, in which the Eastern District of California denied a motion to dismiss, finding the plaintiffs had pled that an "agreement was formed" at certain meetings "in sufficient detail for

10

defendants to establish who agreed to do what activity, when it was supposed to be done and how the activity was accomplished." <u>Stanislaus Food Products Co. v. USS-POSCO Industries,</u> No. CV 09-0560-LJO (SMS), 2011 WL 2678879, at * 7 (E.D. Cal. July 7, 2011).

In <u>Stanislaus</u>, plaintiff alleged the defendants entered a Market Allocation Agreement whereby two defendant competitors agreed to no longer compete in the Tin–Mill Products market in the Western United States. The Court found that plaintiff had alleged sufficient facts alleging the persons involved in the illegal agreement, the roles each person undertook, and details of which persons were involved in which discussions.

The instant case does not resemble <u>Stanislaus</u> in any significant way. <u>Stanislaus</u> involved a specific agreement between competitors that granted one of them the power to dominate a particular market. It was limited in scope and in the timeframe that it was forged. Here, the alleged conspiracy is vast, spans more than 15 years, and involves numerous alleged participants, agreements, and meetings. The amended complaint alleges that there were a number of meetings led by senior Kaiser Permanente executives and union leaders between 1996 and 1997 which resulted in the alleged unlawful conspiracy. (FAC ¶¶ 89-95.) However, the amended complaint fails to specify the dates, locations or participants at the meetings between 1996 and 1997.

Given the scope and nature of the conspiracy, the Court finds Plaintiff has failed to plead sufficient facts demonstrating a verbal conspiracy, the persons involved in the illegal agreement, and the roles that each person undertook.

### c. Circumstantial Evidence/Parallel Conduct

Plaintiff relies on a wide array of parallel and independent activities conducted separately by Kaiser Defendants and Union Defendants as evidence of

a conspiracy to restrain trade. [2]  Plaintiff contends a number of the actions were taken against the Defendants' independent self-interest and demonstrate the existence of an illegal conspiracy.  (FAC ¶¶ 217, 223, 226, 228, 233, 237.)

---

[2] Prime Healthcare alleges the following activities were "coordinated" by Defendants in "secret meetings," and constitute anti-competitive conduct that resulted in a restraint of trade:

(1) Kaiser Defendants are violating the Taft-Hartley act, 29 U.S.C. § 186, by disguising payments to the SEIU under the Labor Management Partnership Trust, which is nothing more than a vehicle to funnel payments directly to the SEIU to knock out Kaiser's competitors.  Kaiser Defendants allegedly paid over $140 million into the Partnership Trust since 2004.  The Trust then transferred over $50 million to the Labor Management Coalition which essentially made direct payments to representatives of the SEIU. These facts demonstrate that the Partnership Trust is a sophisticated money laundering operation, and the payments are part of the benefits the SEIU receives directly for participating in the illegal conspiracy. (FAC ¶¶173-187);

(2) Union Defendants sought to increase the number of healthcare workers it represents by waging pressure campaigns against Kaiser competitors to render those companies less competitive. (FAC ¶¶ 195-97);

(3) Union Defendants targeted Kaiser competitors Columbia/HCA, Tenet and CHW, using tactics such as publicizing reports and studies designed to cast a negative light on the hospitals, some of which resulted in investigations by agencies. (FAC ¶¶198-203);

(4) Union Defendants' organizing tactics resulted in Tenet and CHW "strik[ing] a deal" with Union Defendants, which in turn "raised its cost-structure and made it less of a market threat to Kaiser." (FAC ¶¶202-203);

(5) Union Defendants advocated in favor of two ballot initiatives, which would have increased costs for for-profit hospitals, but later abandoned support of those initiatives after entering into an agreement with the California Hospital Association. (FAC ¶¶ 207-211);

(6) Kaiser Defendants supported Union Defendants' proposal to increase nurse staffing ratios, a decision made against Kaiser's own business interest because increased staffing increases hospital costs and which only served to increase SEIU membership. (FAC ¶¶ 214-20);

(7) Kaiser and Union Defendants negotiated the termination of approximately 1,350 of SEIU-represented Kaiser employees, an action that was not in the best interest of the Union Defendants but strengthened Kaiser's role in the market. (FAC ¶¶ 226-29);

(8) Kaiser Defendants encourages its members to call a "nurse line" before seeking emergency care, in which Kaiser coerces their members to select Kaiser facilities for their emergency room needs instead of non-Kaiser hospitals. (FAC ¶¶ 252-54);

(9) Kaiser Defendants, through threats and intimidation, forces its members to transfer from Prime Healthcare's hospitals to Kaiser facilities, and harasses, intimidates and coerces the treating Prime Healthcare physician to authorize the transfer of the Kaiser member patient. (FAC ¶¶ 254-56);

(10) Kaiser Defendants refuse to pay claims from non-Kaiser hospitals such as Prime Healthcare, thereby raising Prime Healthcare's cost to do business and remain a competitor. (FAC ¶¶ 257-60; 305);

(11) Kaiser Defendants and Union Defendants together increased wages for healthcare workers, reflecting "an attempt to mask its anticompetitive conduct from antitrust scrutiny by taking advantage of the antitrust exemption afforded labor unions under current case law." (FAC ¶ 262);

(12) Defendants together planned a public campaign against Prime Healthcare, which Union Defendants executed beginning in February 2010. (FAC ¶¶ 265-288);

(13) Union Defendants supported California Senate Bill 408, legislation "prepared in retaliation for Prime's November 2010 acquisition of Alvarado Hospital and designed for no purpose other than to restrict Prime's ability to acquire additional hospitals." While many hospitals opposed this measure, Kaiser "stood on the sidelines." The bill was ultimately vetoed by Governor Jerry Brown. (FAC ¶¶ 290-91);

(14) Union Defendants campaigned to block the bankruptcy sale of Victor Valley Community Hospital to Prime Healthcare Services Foundation. (FAC ¶¶ 292-96);

**Civil Action No. 11-cv-2652-GPC-RBB**

Kaiser Defendants contend Plaintiff has pled only parallel or unilateral conduct by Kaiser. (Kaiser Mtn at 10-14.) Kaiser Defendants argue <u>Twombly</u> requires Plaintiff to plausibly allege Defendants' conduct would have been against their independent self-interest absent an unlawful agreement, and the conduct fails to meet that standard because Plaintiff alleges only parallel or unilateral conduct consistent with independent action. (<u>Id.</u>)

While Plaintiff's allegations need not rule out the possibility that Defendants were acting independently, Plaintiff must allege facts at the pleading stage "tending to exclude the possibility of independent action." <u>Twombly</u>, 550 U.S. at 544 (internal citation omitted). "[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." <u>Id.</u> at 557. Examples of an allegation that would suffice under this standard include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." <u>Id.</u> at 556 n.4 (internal quotation marks omitted). One prominent "plus factor" is a showing that the defendants' behavior would not be reasonable or explicable (i.e. not in their legitimate economic self-interest) if they were not conspiring to fix prices or otherwise restrain trade-that is, that the defendants would not have acted

---

(15) By contrast, Union Defendants have not publicized negative information regarding Kaiser's overpayment for reporting excess cases for certain illnesses, assessment of record penalties, mortality rates identified in Kaiser's kidney transplant program, or Occupational Safety and Health Act complaints filed by Kaiser employees. (FAC ¶¶ 302-09);

(16) Kaiser and Union Defendants advocated for the passage of SB 1285, a bill that would require hospitals with an out-of-network emergency utilization rate of greater than fifty percent to adjust charges for out-of-network emergency care. (FAC ¶¶ 312-318);

(17) During a meeting between Prime Healthcare representatives and SEIU-UHW President Dave Regan, Mr. Regan "demanded that Prime enter into an organizing agreement with UHW," and "if Prime did not capitulate to his demands, [Union Defendants] would push the 'Prime Bill', i.e., SB 1285." Prime did not agree and the next day the bill was passed in the California legislature. (FAC ¶¶ 318-20);

(18) Union Defendants have launched unsuccessful litigation against Prime Healthcare. (FAC ¶¶ 321-23)

Civil Action No. 11-cv-2652-GPC-RBB

as they did had they not been conspiring in restraint of trade. <u>See</u>, <u>e.g.</u>, <u>Theatre Enters., Inc. v. Paramount Film Distrib. Corp.</u>, 346 U.S. 537, 540-42 (1954).

The actions relied upon by Plaintiff insufficiently exclude the possibility of independent action. As discussed below, three allegations could suggest the existence of a preceding illegal agreement or actions against the Defendants' self-interests. Upon close review, however, the allegations lack specificity or plausibility to show an illegal conspiracy as required to assert a § 1 claim.

First, Plaintiff's allegations that the Defendants developed a money laundering scheme in violation of the Taft-Hartley Act are conclusory and lack specificity. Plaintiff asserts, and Defendants do not contest, that Kaiser and the SEIU created a Labor Partnership Trust to fulfill the agenda of the Labor Management Agreement. Pursuant to 29 U.S.C. § 186, employers are prohibited to pay any money or thing of value to a labor organization, or officer or employee of a labor organization, which represents employees of the employer. 29 U.S.C. 186(a)(2). Prime Healthcare alleges that over $50 million was transferred from the Partnership Trust to the Labor Coalition, representing an illegal payment directly to the SEIU in violation of Taft-Hartley. (FAC ¶175-182.) These payments purportedly helped advance the conspiracy between the Defendants. (<u>Id.</u>)

The Court finds these allegations do not pass the plausibility standard. As a preliminary matter, Prime Healthcare fails to state why the payments are not exempt under the Taft-Hartley Act. As Defendant SEIU-UHW points out, the Taft-Hartley Act provides an exemption for payments by employers through an authorized labor management committee established under the Labor Management Cooperation Act of 1978. (Dkt. No. 57 at 19; <u>see</u> 29 U.S.C. 186(c)(9)). Moreover, Prime Healthcare fails to provide any clear theory beyond conclusory allegations that would lead the Court to believe that the Partnership

14

Trust, clearly constructed and made publicly available by Kaiser and the SEIU, was anything beyond the explicit purposes encouraged by the Labor Management Agreement. (See Dkt. No.1-3, National Labor Agreement at 26.)  In short, while the allegations at first blush appear alarming, upon further review, the allegations do not show the Defendants were acting in an illegal manner to further a conspiracy.

Next, Plaintiff alleges Kaiser Defendants in 2001 supported Union Defendants' proposal to increase nurse staffing ratios, a decision against Kaiser's economic self-interest because it would increase staffing costs. (FAC ¶¶ 214-220.) Plaintiff asserts that Kaiser's support of the proposal only made sense when looked at in the context of an illegal agreement whereby Kaiser helped the SEIU increase the ranks of membership in exchange for assurances that Kaiser's competitors would also be burdened by the increased costs of hospital care. (FAC ¶ 219.)

As an initial matter, Kaiser Defendants' endorsement of a proposal to increase nurse staffing ratios would appear to be against Kaiser's business interest in containing labor costs.  The inquiry thus turns to whether the endorsement resulted from chance, coincidence, or independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties. Ultimately, the endorsement did not lead to the passage of legislation increasing nurse staffing ratios and thus did not result in actual harm to Kaiser's business interest.  Given the surrounding context of the endorsement, Plaintiff has failed to show it is plausible that the endorsement was against Kaiser's economic self-interest or resulted from an illegal agreement between the Defendants to restrain trade.

Finally, Plaintiff alleges that in 2009, Kaiser and Union Defendants negotiated the termination of approximately 1,350 SEIU-represented Kaiser

employees, an action that was not in the economic interest of the Union Defendants. (FAC ¶¶ 227-28.) Plaintiff argues that the terminations of union employees reduced Kaiser's expenses and strengthened its position in the market with no apparent benefit to the labor movement. According to Plaintiff, such conduct only made sense in the context of the alleged conspiracy. (FAC ¶ 228.)

The termination of 1,300 SEIU-represented Kaiser employees, on its face, appear to be contrary to the Union Defendants' economic interest. The remaining question is whether Defendants would not have acted in this manner had they not been conspiring in restraint of trade. In answering the question, the Court looks to the nature and timing of the action, and its context in the alleged conspiracy.

In the normal give and take that is part of the employer/union relationship, each side makes concessions to the other which result in a global agreement where both sides come away with bargained for benefits, wages and conditions. Furthermore, the 2009 termination of employees took place twelve years following the beginning of the alleged creation of a conspiracy to restrain trade. It is an isolated action during an alleged fifteen year conspiracy and is not part of an ongoing pattern or practice. Given its solitary nature, the termination action does not circumstantially prove the existence of a huge antitrust conspiracy with multiple objectives and goals.

Upon close review of the Plaintiff's allegations, the Court concludes that Plaintiff has not sufficiently alleged the existence of an illegal agreement. Despite the length and excessive detail, Plaintiff's complaint continues to be plagued by vagueness and ambiguity. Even assuming all the facts are accurate, Plaintiff still has not shown it is plausible that Defendants entered into an illegal conspiracy or agreement. As such, the Plaintiff has not satisfied the first prong of a § 1 claim.

## 2. Unreasonable Restraint of Trade

As Plaintiff will have a third opportunity to amend the complaint, the Court briefly addresses whether the antitrust claim sufficiently alleges the second and third prongs of a § 1 violation, whether Defendants intended to restrain trade and whether the alleged agreement resulted in actual injury to competition.

### a. *Per Se* v. Rule of Reason

The parties dispute which rule the Court should apply in assessing an unreasonable restraint of trade. The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of Section 1. <u>Leegin</u>, 551 U.S. 886 (citing <u>Texaco Inc. v. Dagher</u>, 547 U.S. 1, 5 (2006)). "Under this rule, the fact finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." <u>Leegin, 547 U.S. 5.</u> (citing <u>Cont'l T.V., Inc. v. GTE Sylvania Inc.</u>, 433 U.S. 36, 49 (1977).

"Certain categories of agreements, however, have been held to be *per se* illegal, dispensing with the need for case-by-case evaluation." <u>Bus. Elecs. Corp. v. Sharp Elecs. Corp.</u>, 485 U.S. 717, 723 (1988). The *per se* rule treats categories of restraints as necessarily illegal, eliminating the need to study the reasonableness of an individual restraint in light of the real market forces at work. <u>Id.</u> The categories subject to the *per se* rule include horizontal price fixing, division of markets, group boycotts, tying arrangements, and output limitations. <u>American Ad Management, Inc. v. GTE Corp.</u>, 92 F.3d 781, 784 (9th Cir. 1996) (internal citations omitted). A *per se* restraint must have "manifestly anticompetitive effects" and "lack…any redeeming virtue." <u>Leegin</u>, 551 at 886 (citing <u>GTE Sylvania</u>, 433 U.S. at 50; <u>N.W. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.</u>, 472 U.S. 284 (1985)). Moreover, "a departure from the rule-of-

17          **Civil Action No. 11-cv-2652-GPC-RBB**

reason standard must be based upon demonstrable economic effect rather than…upon formalistic line drawing." Id.

Citing Klor's Inc., v. Broadway-Hale Stores, Inc., 359 U.S. 207 (1959), Prime Healthcare contends the alleged agreement warrants a *per se* analysis because it consists of a horizontal conspiracy among union members, their leadership, and the entities themselves and is facilitated by a vertical agreement with Kaiser Defendants. (Prime Reply at 33; see also FAC ¶ 43.) Plaintiff asserts that, together, the horizontal and vertical agreements comprise an "overarching conspiracy" that warrants a *per se* analysis of an unreasonable restraint of trade. Plaintiff further asserts the *per se* rule applies because Union Defendants are "merely a horizontal conspiracy of workers, leaders and union entities," unprotected by labor exemptions and as such, antitrust law forbids them to engage in concerted action to influence prices. (Prime Reply at 33-37; see also FAC ¶¶ 46- 47.)

Kaiser Defendants argue Plaintiff's allegations do not fall within any of the categories subject to the *per se* rule. (Kaiser Mtn. at 17-19.) Kaiser also contends the union is a single entity, not a conspiracy involving a horizontal agreement. (Id.) As a result, Kaiser Defendants argue the alleged conspiracy does not warrant a *per se* analysis, but rather application of the rule of reason. (Id.)

Plaintiff's reliance on Klor's is misplaced and does not support application of the *per se* rule. Klor's is distinguishable in that the plaintiff had sufficiently pled that a combination of manufacturers, distributors and a retailer engaged in a boycott deprived the plaintiff its freedom to purchase goods in an open competitive market. Klor's, 359 U.S. at 212. Unlike Klor's, Prime Healthcare has failed to cite such economic deprivation or anticompetitive effects to warrant the application of a *per se* analysis. None of the allegations against Kaiser Defendants or Union Defendants, such as legislative advocacy, litigation,

publicizing reports or speaking out publicly on certain issues even remotely suggests the type of "manifestly anticompetitive" conduct intended to warrant the application of the *per se* rule. See <u>Leegin Creative Leather Products, Inc. v. PSKS, Inc.</u>, 551 U.S. 877, 886-87 (2007).

Plaintiff's arguments in favor of the *per se* rule fail for several additional reasons. Plaintiff has not pled any of the Defendants activities fall under the categories subject to the *per se* rule, such as group boycotts, horizontal price fixing, division of markets, tying arrangements, and output limitations. Nor does Plaintiff allege Union Defendants are a horizontal combination of *competitors* organized to exclude *direct competition*, which the Supreme Court condemned in <u>Eastern States Retail Dealers' Association v. United States</u>, 234 U.S. 600 (1914) (emphasis added). The allegations are also distinct from <u>Allen Bradley</u>, where the unions negotiated "closed shop agreements," which limited the contractors' freedom to purchase equipment only from manufacturers with "closed shop agreements," and also limited manufacturers' sales only to contractors employing union members. <u>Allen Bradley Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers</u>, 325 U.S. 797, 799 (1945). Here, Prime Healthcare has not pled such allegations suggesting the SEIU or SEIU-UHW have engaged in similar agreements that would warrant the application of a *per se* rule.

For the reasons stated above, the Court applies the rule of reason analysis to determine an unreasonable restraint of or injury to competition.

### b. Restraint of Trade and Injury to Competition

To prevail on an antitrust claim under the "rule of reason" standard a plaintiff must plead facts which, if true, will prove four elements: "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually

injures competition. [citation]. In addition to these elements, plaintiffs must also plead (4) that they were harmed by the defendant's anti-competitive contract, combination, or conspiracy, and that this harm flowed from an "anti-competitive aspect of the practice under scrutiny. [citation]." <u>Brantley v. NBC Universal, Inc.</u>, 675 F.3d 1192, 1197 (9th Cir. 2012) <u>cert. denied,</u> 133 S. Ct. 573, 184 L. Ed. 2d 374 (U.S. 2012) (internal citations omitted).  Ultimately, "no antitrust violation occurs unless the exclusive agreement is intended to or actually does harm competition in the relevant market." <u>Rutman Wine Co. v. E. & J. Gallo Winery</u>, 829 F.2d 729, 735 (9th Cir. 1987).

Although Plaintiff has not sufficiently alleged a contract, combination or conspiracy, the Court addresses the additional elements needed to show a Section 1 violation below.

### i. Relevant Market

"The factual support needed to show injury to competition must include proof of the relevant geographic and product markets and demonstration of the restraint's anticompetitive effects within those markets."  <u>Les Shockley</u>, 884 F.2d at 508 (citing <u>Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.</u>, 875 F.2d 1369 (9th Cir.1989).  An antitrust claim will survive a motion to dismiss "unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect" or is "facially unsustainable." <u>Newcal Industries, Inc. v. Ikon Office Solution</u>, 513 F.3d 1038, 1044 (9th Cir. 2008) ("There is no requirement that [the market definition and market power] elements of the antitrust claim be pled with specificity").  "The validity of the 'relevant market' is typically a factual element rather than a legal element, [and so] alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or at trial." <u>Id.</u> (citing <u>High Technology Careers v. San Jose Mercury News</u>, 996 F.2d 987, 990 (9th Cir. 1993)).  "There are, however, some legal principles that govern the

**Civil Action No. 11-cv-2652-GPC-RBB**

definition of an antitrust 'relevant market,' and a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." Id. (citing Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436-37 (3d Cir. 1997).

In the FAC, Prime Healthcare alleges Kaiser owns fifteen hospitals, Kaiser is affiliated with ten other hospitals, and Kaiser contracts with over 100 hospitals in the relevant healthcare services market. (FAC ¶ 37.) Prime Healthcare further alleges specific service markets. (FAC ¶¶ 32-36; "The relevant service markets are (1) hospital emergency care services provided at Kaiser and non-Kaiser facilities to the general public; (2) general acute-care hospital services, which encompasses a broad cluster of basic medical diagnostic and treatment services provided at Kaiser and non-Kaiser facilities; and (3) the services provided by healthcare workers at Kaiser and non-Kaiser facilities, including but not limited to direct patient care duties essential to the provision of the services described in (1) and (2).") Plaintiff further alleges the relevant geographic market includes San Bernardino, San Diego, Los Angeles, and Orange Counties, California. (Id.) Plaintiff also identifies several subregional geographic markets. (Id.) Kaiser Defendants do not object to the first two product markets in which Kaiser competes. (Kaiser Mtn. at 20 n. 18.) Upon review of Plaintiffs allegations, and finding no facial or legal defect, the Court concludes Plaintiff has sufficiently pled the relevant markets.

### ii. Injury to Competition

"It can't be said often enough that the antitrust laws protect competition, *not* competitors." United States v. Syufy Enters., 903 F.2d 659, 668 (9th Cir.1990). Consequently, "[t]o succeed on a rule of reason claim, an antitrust plaintiff must prove that the restraint in question injures competition in the relevant market." Roberts Waikiki U–Drive, Inc. v. Budget Rent–A–Car, Inc., 732 F.2d 1403, 1408

21                                      Civil Action No. 11-cv-2652-GPC-RBB

(9th Cir.1984) (citing <u>Kaplan v. Burroughs Corp.</u>, 611 F.2d 286, 291 (9th Cir.1979)). "In order to plead injury to competition . . . sufficiently to withstand a motion to dismiss, 'a section one claimant may not merely recite the bare legal conclusion that competition has been restrained unreasonably.' " <u>Brantley v. NBC Universal, Inc.</u>, 675 F.3d 1192, 1198 (9th Cir.2012) (citing <u>Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n</u>, 884 F.2d 504, 507–08 (9th Cir.1989)). A claimant " 'must, at a minimum, sketch the outline of [the injury to competition] with allegations of supporting factual detail.' " <u>Id.</u> (citing <u>Les Shockley Racing, Inc.</u>, 884 F.2d at 508). Such allegations must "raise a reasonable expectation that discovery will reveal evidence of" an injury to competition. <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. 544, 556 (2007).

Kaiser Defendants contend Plaintiff has failed to allege injury to competition. (Kaiser Mtn. at 25.) Kaiser Defendants argue Prime Healthcare's allegations that Defendants conspired to force Prime to spend resources in countering litigation claims, legislative battles, and government investigations fails to show actual injury to competition. (<u>Id.</u>) Even further, Kaiser Defendants argue Prime Healthcare has failed to allege anything about the extent of expenses it incurred or its ability to compete in the market. (<u>Id.</u> at 25-26.)

Prime Healthcare argues the Defendants conspiracy involved a coordinated attack on Prime and other non-union hospitals operating at lower costs with better pricing. (Prime Reply at 39; <u>see</u> <u>also</u> FAC ¶ 332.) Prime contends Kaiser's ability to spend a low amount of resources on emergency and acute care services, collect higher profits, and limit its spending on its own hospital facilities and services results in harm to overall competition within the relevant market. (<u>Id.</u>) These specific allegations include: Kaiser Defendants' refusal to pay claims for treatment of Kaiser members at Prime hospitals (FAC ¶¶ 258-60, 305); sham counterclaims in litigation to recover payment for treating Kaiser members (FAC

¶ 271); refusal to pay physicians who provide emergency services to Kaiser members at Prime hospitals (FAC ¶ 257); and disparagement of Kaiser's competitors for the purpose of disrupting those competitors' businesses, driving up their costs, and requiring them to spend time and substantial resources that they would not otherwise incur. (FAC ¶¶ 195-205, 212- 215, 320, 323.)  Regarding Union Defendants' actions, Prime Healthcare alleges the SEIU engaged in a publicity campaign against them which resulted in harm to Prime Healthcare and overall competition.  Plaintiff alleges Union Defendants sought to increase the number of healthcare workers in the industry and utilized pressure tactics against them and other hospitals to advance labor objectives and increase the cost of business. (FAC¶¶ 195-203.)  The campaign included publicizing information about Prime's compliance with California laws; issuing studies regarding Prime Healthcare's rate of septicemia; lobbying U.S. House of Representatives and California legislative members on the issue of septicemia; distributing articles about Prime Healthcare's Medicare data; and other activities against Prime and other non-labor hospitals. (FAC ¶¶ 265-91.)

Assuming *arguendo* that Prime Healthcare had sufficiently pled the existence of an illegal agreement, Plaintiff has not sufficiently pled facts showing the Defendants intended to harm trade or Defendants' actions caused injury to overall competition.  For example, Kaiser, as a competitor in the relevant market, allegedly filed counterclaims in Prime Healthcare-initiated litigation to recover fees. Prime Healthcare's conclusory assertion that the counter-claims are "sham" does not show an intent to restrain trade.  Nor do the actions taken by SEIU to launch a "publicity campaign" against Prime Healthcare suggest intent to restrain trade.  Rather, the face of the complaint suggests the union engaged in traditional union activities to pressure non-labor entities to become unionized.

Moreover, Prime Healthcare has not sufficiently stated that the Defendants' actions actually injured competition. Plaintiff fails to plead supportive facts beyond conclusory statements that, as a result of Defendants actions, Prime Healthcare or other hospitals were injured or pushed out of the relevant market, or that consumers actually faced higher prices, reduced quality of care and quantity of services, and reduced choice as a result of the Defendants' actions. Any resources Prime Healthcare spent as a result of the Defendants' actions – whether addressing the septicemia issue before the state legislature or initiating litigation to recover fees from Kaiser- do not show actual injury to competition. See McGlinchy v. Shell Chem. Co., 845 F.2d 802, 811 (9th Cir. 1988) (explaining the alleged violation must cause injury to competition beyond the impact on the claimant). Thus, the alleged injury incurred by Kaiser Defendants' refusal to pay claims for Prime's services, the Defendants' initiation of purported sham litigation, or Prime's costs in defending itself in government investigations show only potential harm to Prime Healthcare alone. There are no non-conclusory allegations that Defendants' actions restrained trade in the relevant market or injured overall competition.

For these reasons, the Court finds that Prime Healthcare has not shown intent to restrain trade or actual injury to competition. As such, Plaintiff has also failed to demonstrate the second element and third elements of a Section 1 violation. Plaintiff's failure to plead all elements of a Section 1 violation warrant dismissal of Plaintiff's amended complaint.

Thus, the Court **GRANTS** Kaiser Defendants' motion to dismiss without prejudice as to the first claim against all defendants. As Union Defendants joined in Kaiser Defendant's motion to dismiss, the Court also **GRANTS** SEIU and SEIU-UHW's motions to dismiss for the same reasons.

**B. Violation of Section 2 of the Sherman Act**

Prime Healthcare's second, third, and fourth claims against Kaiser Defendants arise out of Section 2 of the Sherman Act. (FAC ¶¶ 339–396.)

**1. Monopolization**

To prevail on a claim of monopolization under Section 2, Prime Healthcare must allege the following: "(1)[p]ossession of monopoly power in the relevant submarket; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury." Forsyth v. Humana, Inc., 114 F.3d 1467, 1475 (9th Cir. 1997) aff'd sub nom. Humana Inc. v. Forsyth, 525 U.S. 299 (1999) and overruled on other grounds by Lacey v. Maricopa County, 693 F.3d 896 (9th Cir. 2012) (internal citations omitted). Monopoly power is "the power to control prices or exclude competition." Forsyth, 114 F.3d at 1467.

Kaiser Defendants move to dismiss Prime Healthcare's second claim for monopolization because it fails to plead that Kaiser possessed, willfully acquired or maintained monopoly power. (Kaiser Mtn at 27.)

As previously discussed, Prime Healthcare failed to sufficiently allege injury to competition within the relevant market. The Court further finds that Plaintiff has failed to establish market power. Although Section 1 and 2 claims are distinct, the methods for establishing monopoly power are essentially identical to those for establishing market power. Forsyth, 114 F.3d at 1467 (citing Rebel Oil, 51 F. 3d at 1421).

Market power may be demonstrated through direct evidence of the injurious exercise of market power or circumstantial evidence pertaining to the structure of the market. Rebel Oil, 51 F.3d at 1434. "To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are

significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." Id.  Put differently, "one traditional way to demonstrate market power is by defining the relevant product market and showing defendants' percentage share of that market. Todd v. Exxon Corp., 275 F.3d 191, 199 (2d Cir. 2001).  However, market power defined as a percentage market share is not the only way of estimating market power.  Id., 275 F. 3d at 206 (citing Toys "R" Us, Inc. v. FTC, 221 F.3d 928, 937 (7th Cir. 2000) (noting "the share a firm has in a properly defined relevant market is only a way of estimating market power").  "If a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power." Id.  Moreover, Plaintiff may demonstrate market power by alleging direct proof of restricted output and supracompetitive prices.  Rebel Oil, 51 F.3d at 1434.

Kaiser Defendants argue Plaintiff has not sufficiently alleged Kaiser possesses a dominant share of the relevant markets, and thus Plaintiff has failed to demonstrate Kaiser exercises market power.  (Kaiser Mtn. at 20-24.)  Prime Healthcare responds that it has met the minimal requirements for pleading market power by alleging Kaiser Defendants' dominance, barriers to new competitors entering the market, and evidence of supracompetitive prices and restricted output. (Prime Reply at 38-40.)

Plaintiff has not shown sufficient circumstantial evidence that Kaiser Defendants own a dominant share of the market.  Prime Healthcare alleges Kaiser Defendants are the "dominant force in the alleged relevant hospital markets, with substantial market share and power." (FAC  ¶ 40.)  There are no other factual contentions in the amended complaint that support this conclusory statement. Given the lack of factual allegations regarding Kaiser's market share, the Court concludes Plaintiff has not alleged Kaiser owns a dominant share of the relevant

market, a critical element to demonstrate circumstantial evidence of market power.[3]

Prime Healthcare's allegations that Kaiser Defendants have supracompetitive prices and restricted output are vague and conclusory.  Prime Healthcare alleges Kaiser Defendants have the power to control prices exclude competition in the relevant markets. (FAC ¶ 39.)  However, this statement reveals only that Kaiser has the *power* to control prices, not that Kaiser has *in fact* controlled prices.  Without further facts to support the plausible inference that there was a restriction in output or supracompetitive prices, and having failed to plead Kaiser owns a dominant share of the relevant market, the Court is unable to leap to the conclusion that Kaiser possesses market power.  Having concluded Plaintiff has not proven market power or injury to competition, Plaintiff has also failed to state a claim for monopolization under Section 2.

**2. Attempted Monopolization**

To prevail on a Section 2 claim for attempted monopolization, "a plaintiff must demonstrate four elements: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed toward accomplishing that purpose; (3) a dangerous probability of success; and (4) causal antitrust injury." Forsyth, 114 F.3d at 1477 (citing Rebel Oil Co., 51 F.3d at 1433).  Kaiser asserts that the claim of attempted monopolization fails because Prime's allegations of specific intent to monopolize and dangerous probability of achieving monopoly power are conclusory. (Kaiser Mtn at 28.)  Prime argues it has sufficiently alleged a claim for attempted monopolization. (Prime Reply at 53.)

---

[3] At this time, the Court refrains from taking judicial notice of publicly available information showing Kaiser's market share.

Civil Action No. 11-cv-2652-GPC-RBB

The Court finds Prime Healthcare has failed to satisfy the first two elements necessary to plead a claim for attempted monopolization. To satisfy the first element, Prime Healthcare alleges Kaiser Defendants have "purposefully engaged" in anticompetitive conduct "with the specific design and purpose to raise the costs of competitors." (FAC ¶ 328, 354.) Yet Prime Healthcare alleges Kaiser merely had the power to control prices – not that it in fact controlled prices. (FAC ¶ 39.) Prime alleges there is "a dangerous probability that… Kaiser Permanente will succeed in acquiring, maintaining, and/or expanding its monopoly power;" a claim that also falls short of alleging specific intent to control prices. As previously discussed, Prime Healthcare has not shown the Defendants were engaged in a conspiracy with intent to restrain trade, and Plaintiff's reliance on the same allegations similarly fails to satisfy the claim for attempted monopolization.

### 3. Conspiracy to Monopolize

Finally, "[t]o prove a conspiracy to monopolize in violation of § 2, Plaintiff must show four elements: (1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." Stanislaus Food Prods., 2011 U.S. Dist. LEXIS, at *12 (citing Paladin Assocs., Inc. v. Mont. Power Co., 328 F.3d 1145, 1158 (9th Cir. 2003)). Prime Healthcare has failed to plead the existence of a conspiracy for Section 1 violation, and thus has also failed to satisfy the first element for conspiracy to monopolize under Section 2.

Accordingly, Plaintiff has not sufficiently pled Section 2 claims for monopolization, attempted monopolization, and conspiracy to monopolize. Thus, Court **GRANTS** Kaiser Defendants' motion to dismiss the second, third, and fourth claims for Section 2 violations.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS** Kaiser Defendants' and Union Defendants' motions to dismiss. (ECF Nos. 57, 59, 64.)  Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** Plaintiff's entire amended complaint as to all defendants.   If Prime Healthcare wishes, it **SHALL FILE** an amended complaint within thirty days of the date this Order is electronically docketed.  Failure to file an amended complaint by this date may result in dismissal with prejudice.

**IT IS SO ORDERED.**

DATED: July 25, 2013

_____

HONORABLE GONZALO P. CURIEL